UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

LINDA BOLIN, an individual,                    )
                                               )
            Plaintiff,                         )
                                               )
v.                                             )        Case No. 04-CV-0516-CVE-SAJ
                                               )
OKLAHOMA CONFERENCE OF THE                     )
UNITED METHODIST CHURCH, and                   )
REV. DANNY MOSS, an individual,                )
                                               )
                                               )
            Defendants.                        )

<u>**OPINION AND ORDER**</u>

Now before the Court is defendants' motion for summary judgment (Dkt. # 38) as to the

claims brought against them by plaintiff Linda Bolin ("Bolin") for intentional infliction of emotional

distress, unlawful termination in violation of Oklahoma public policy, sexual harassment and

retaliation in violation of Title VII of the Civil Rights Act of 1964, and slander.

**I.**

Plaintiff was employed by the Tulsa District Office of the Oklahoma Conference of the

United Methodist Church ("UMC") from June 2000 until June 4, 2002.  Specifically, she worked

as administrative assistant for Rev. Danny Moss ("Moss"), the district superintendent.  Bolin's

husband, Rev. Buddy Bolin, also worked in this district as associate minister for St. James United

Methodist Church in Tulsa.  Moss was the UMC cabinet representative responsible for

recommendations as to Rev. Bolin's appointments and compensation.

Sometime in the fall of 2001, relations between Rev. Bolin and the congregation at St. James

broke down and the congregation apparently asked that he be reassigned.  Plaintiff alleges that this

request may have been prompted by Rev. Bolin's complaints to the Bishop about Gary Harber (the pastor in charge at St. James) and Moss.  In October or November 2001, the cabinet appointed Rev. Bolin to a position which would have resulted in a significant decrease in pay compared to his position at St. James.

In January 2002, Moss interrupted plaintiff Bolin as she was making changes to the compensation forms of Rev. Bolin and another minister. Moss chastised her for interfering in compensation procedures related to her spouse. There is some dispute as to whether he admits that he was mistaken and had actually given her permission to change the forms.  Later that month, on January 24, 2002, plaintiff asserts that while Moss was looking over her shoulder at something she was working on, he commented:  "If you would just cooperate, [Rev. Bolin] may not have to take such a drastic cut in salary."  She alleges that, as he said this, he brushed against her breast.  Plaintiff alleges that she responded to this remark and touching by getting up immediately, running to the bathroom, and bursting into tears.  Moss denies the incident occurred.  There are no eyewitnesses. Plaintiff has admitted that she does not know what Moss meant when he referred to "cooperation," but she has taken it to mean something physical or sexual.

Plaintiff next alleges that, during the week of January 28, 2002, Moss cornered her in the supply room at the office and said "I told you that [Rev. Bolin] would take a cut in pay for embarrassing me like he did by those complaints he filed."  She alleges that when she tried to leave the room, he blocked her passage, and said, "Now, you do a wonderful job here at the District Office and you are welcome to stay as long as you want and like I said before, [Rev. Bolin] may not have to take a huge cut in salary."  She alleges that he then began rubbing her shoulders and said, "I'm sorry it has to be this way."  Plaintiff claims that Moss continued to sexually harass her throughout

2

February and March 2002 by brushing against her hands as he took things from her or handed them to her.

Sometime in the spring of 2002, Moss allegedly told the pastor of St. James that plaintiff was untrustworthy; the pastor repeated this to his staff.  At some point during this period, Rev. Bolin wrote the Bishop complaining about his appointment, and mentioning a "sometimes hostile" working environment endured by plaintiff.  He did not specify the nature of the hostility and there is dispute as to whether the reason Rev. Bolin mentioned it was because Moss had himself mentioned tension in the office to Rev. Bolin.

On April 29, 2002, a meeting took place between Revs. Bolin, Moss, and Combs, and plaintiff Bolin.  The purpose of the meeting was to discuss a reconsideration of Rev. Bolin's appointment and the mention of "hostile" work environment.  However, Rev. Bolin does not remember knowing about his wife's allegations of inappropriate touching at that time, and does not remember any discussion of sexual harassment taking place at the meeting.

Rev. Combs, who had run the meeting as a neutral party, made notes on what occurred and sent them to Moss.  He claims that he sent them in an envelope marked "Personal and Confidential Materials"(underlined three times) and specifically addressed to Moss at the Tulsa District Office. On May 20, 2002, plaintiff received and opened the envelope containing these notes, to which she alleges there was a post-it note attached saying "This is [plaintiff's] problem, not yours."  Realizing the documents involved her, she xeroxed the notes, and put them and what she alleges to have been the original envelope (which was not marked "confidential") with the rest of the mail on Moss' desk.

3

Moss claims he was greatly upset by this alleged invasion of his privacy and breach of trust (opening his confidential mail). He called a meeting with plaintiff and Rev. Wylie on May 24, 2002. The parties dispute whether a policy that confidential mail be left unopened was instituted or merely restated and perhaps clarified at this meeting. Plaintiff insisted that she had done nothing wrong, and was warned to be careful, but was not fired. She alleges that she told Moss, after this meeting, that she would be hiring an attorney and filing charges with the United States Equal Employment Opportunity Commission ("EEOC"). She did file charges with the Oklahoma Human Rights Commission ("OHRC") on May 24, 2002, but neither the UMC nor Moss received notice from the OHRC of the charges until after June 4, 2002.

After the May 24 meeting, Moss further inquired of Combs about the markings on the envelope. Believing on the basis of what he learned from Combs that plaintiff had lied about the envelope and substituted an unmarked on for the one marked "confidential," he decided to fire her. He did so on June 4, 2002.

Plaintiff wrote a letter complaining about Moss to Bishop Blake on May 13, 2002. The letter specifically refers to Moss' failed ministry, his "harassment" of two other church women (calling them at home at night asking for documents regarding another pastor), his criticism of her husband, and finally, his "sexual harassment" of herself. She claims, in the letter, that Moss threatened to terminate her soon. This letter is dated May 13, 2002. However, there is significant confusion and dispute as to both how and when it was delivered. Regardless, the Bishop claims not to have received it until after plaintiff was terminated. He wrote his answer to her on June 5, 2002, the day after she was terminated.

4

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

Plaintiff's first claim alleges that she is entitled to relief under the common law tort of intentional infliction of emotional distress.  Oklahoma recognizes as an independent tort the intentional infliction of emotional distress, also known as the tort of outrage. Gaylord Entertainment v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  In order to prevail on this claim, plaintiff must show that (1) defendant acted intentionally or recklessly; (2) defendant's conduct was extreme and outrageous; (3) defendant's conduct caused plaintiff emotional distress; and that (4) the resulting emotional distress was severe.  Computer Publications, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002).

Recovery under this theory is governed by very narrow standards, however, and "it is the trial court's responsibility initially to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the [Restatement (Second) of Torts § 46] standards. Gaylord, 958 P.2d at 149.  A plaintiff must show the defendant engaged in conduct that was not only unreasonable but also was "beyond all possible bounds of decency in the setting in which it occurred" and was such that it can be "regarded as utterly intolerable in a civilized community." Id. at n. 92 (quoting Restatement (Second) of Torts § 46(1) and cmt. d). "[C]onduct is not extreme and outrageous if it amounts to no more than mere insults, indignities, or petty oppressions." Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1388 (10th Cir. 1991).

Oklahoma courts have examined a variety of conduct claimed to be outrageous in the employment context, setting a very high standard for actionable conduct.  See Eddy v. Brown, 715 P.2d 74 (Okla. 1986) (supervisor and foreman ridiculing plaintiff in the workplace not actionable); Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla. Civ. App. 1998) (employer calling

plaintiff in the middle of the night and browbeating him for hours, requiring him to do unnecessary work, and making derogatory sexual comments about plaintiff's fiancee not actionable); Anderson v. Oklahoma Temporary Services, Inc., 925 P.2d 574 (Okla. Civ. App. 1996) (six events over a two-year period, including supervisor making lewd remarks about plaintiff and embarrassing her by discussing her faults with co-workers, not actionable).   Similarly, the Tenth Circuit, interpreting Oklahoma law, has reinforced the narrowness of the standard to be met for liability for intentional infliction of emotional distress. See Daemi, 931 F.2d at 1388 (affirming district court decision that employer that called employee derogatory names based on national origin, compelled him to terminate or otherwise eliminate his Iranian subordinates because of their national origin, impugned his integrity by accusing him of criminal acts and requiring him to take a polygraph, and ridiculed him publically at seminars not actionable under tort for intentional infliction of emotional distress).

Plaintiff has here alleged that her employer twice rubbed her shoulders, that he told a fellow church employee that she was untrustworthy, and that he failed to praise her in informing the UMC community that she was no longer employed.  Two affidavits provide evidence that plaintiff suffered from lack of sleep.  There is no evidence in the summary judgment record, however, that she ever sought counseling to alleviate any emotional distress resulting from this experience.  The Court finds that, even taken in the light most favorable to the plaintiff, the summary judgment record does not contain behavior sufficiently outrageous to support a claim for intentional infliction of emotional distress.  Defendant's motion should be granted as to this claim.

## IV.

Plaintiff's second claim alleges that she is entitled to relief based upon defendant's alleged violation of the Oklahoma Anti-Discrimination Act ("OADA").   The OADA prohibits

discrimination in employment based on a person's race, color, national origin, sex, religion, handicap or age.  See Okla. Stat. tit. 25, § 1302.  However, the OADA does not provide a private right of action to persons who allege employment discrimination on the basis of gender.  See Tate v. Browning-Ferris, Inc., 833 P.2d 1218, 1229 (Okla. 1992).

Plaintiff does not pursue a private right of action under the OADA, but rather contends that the OADA articulates a clear public policy goal which allows plaintiff to pursue a Burk tort claim. In Burk v. K-Mart Corp., 770 P.2d 24 (Okla. 1989), the Oklahoma Supreme Court recognized a public policy exception to the employment-at-will doctrine when an employee is subjected to adverse treatment that contravenes an important Oklahoma public policy goal.  Id. at 28.

In Collier v. Insignia Fin. Group, 981 P.2d 321 (Okla. 1999), the Oklahoma Supreme Court considered whether a Burk public policy tort claim for gender discrimination could be pursued in light of the remedies available under state anti-discrimination laws.  Id. at 322.  The Oklahoma Supreme Court held that the administrative remedy provided by the OADA was inadequate to fully vindicate the rights of gender discrimination victims.  Id. at 326.  Predicated upon the existence of an Oklahoma public policy against gender discrimination and the inadequacy of the state statutory remedy, the Oklahoma Supreme Court determined that victims of quid pro quo sexual harassment could assert a state law tort claim under Burk.

Thereafter, in Clinton v. Oklahoma, ex rel., Logan County Election Board, 29 P.3d 543 (Okla. 2001), the Oklahoma Supreme Court addressed the issue of whether an adequate federal remedy precluded a state law tort claim under Burk for gender discrimination.  In Clinton, the plaintiff sought to amend her complaint to add a public policy tort claim for gender discrimination

8

on the basis of the OADA.  Id. at 544.  The Oklahoma Supreme Court determined that the plaintiff

was not eligible to bring a Burk tort claim because an adequate federal remedy was available to her:

> When a statutory remedy adequately accomplishes the goal of protecting Oklahoma
> public policy, a common law remedy is not needed.  While a federal statute cannot
> by itself serve as a statement of Oklahoma policy, a federal statutory remedy may be
> as effective as an Oklahoma statutory remedy in dissuading employers from
> discharging employees for reasons that violate Oklahoma public policy.
> Accordingly, we hold the existence of a federal statutory remedy that is sufficient to
> protect Oklahoma public policy precludes the creation of an independent common
> law claim based on the public policy exception to the employment-at-will doctrine.

Id. at 546.

Plaintiff has a federal statutory remedy under Title VII which adequately protects the public

policy Oklahoma has against gender discrimination.  See 42 U.S.C. § 2000e et seq.  In Clinton, the

Oklahoma Supreme Court held that a violation of an Oklahoma public policy is not actionable where

there exists an adequate federal statutory remedy.  29 P.2d at 546.  Considered in light of List v.

Anchor Paint Company, 910 P.2d 1011 (Okla. 1996), and Marshall v. OK Rental & Leasing, Inc.,

939 P.2d 1116 (Okla. 1997), the remedy provided by Title VII comports with the adequacy

requirements of the Oklahoma Supreme Court.  Accordingly, this Court finds that Title VII provides

an adequate remedy for plaintiff's alleged discrimination, and that as a matter of law plaintiff cannot

state a public policy tort for her alleged gender discrimination.

Plaintiff contends, however, that such an interpretation of the Clinton decision creates an

unconstitutional special law favoring victims of disability discrimination and denies equal protection

to victims of other forms of employment discrimination.  Plaintiff alleges that disabled victims of

employment discrimination in Oklahoma are entitled to substantially greater damages under the

OADA than the federal anti-discrimination statutes provide.  Plaintiff contends that because victims

of disability discrimination may bring simultaneous actions under the Americans With Disabilities

9

Act ("ADA") and the OADA, victims of disability discrimination may recover the full measure of their damages in excess of the federal caps.  Plaintiff notes that Title VII places limitations upon her recovery of money damages.  Plaintiff contends that the disparity between her potential recovery under Title VII and the remedial scheme available to victims of disability discrimination constitutes unequal treatment of similarly situated individuals and is unconstitutional.

To prevail, plaintiff's argument would require this Court to find that all civil litigants who have been discharged in violation of Oklahoma public policy comprise a single class, and are all similarly situated individuals.  However, plaintiff cites no authority, and the Court is unaware of any, to support the proposition that all employees who have been discharged in violation of Oklahoma public policy (whether based upon whistle-blowing, gender discrimination, age discrimination, disability discrimination, or other policy grounds) are a single class that must be given identical treatment.  Rather, the holdings of the Supreme Court in Kimel v. Florida Bd. of Regents, 528 U.S. 62 (2000), and Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001), support a finding that such litigants do not comprise a single class.  In Kimel the Supreme Court held that the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., does not abrogate the sovereign immunity of the States to allow for private suits by state employees, while in Garrett the Supreme Court made a similar finding as to the ADA.  In holding that the ADEA and ADA did not abrogate State sovereign immunity, the Supreme Court eliminated the ability of state employees to bring suits to enforce the ADEA and ADA against their employers, the State governments.  This effectively left state employees solely protected by state age discrimination and disability discrimination statutes, which vary widely across the fifty states.  The Supreme Court found no constitutional problem in allowing employees of the federal government and employees in the

10

private sector to continue to receive the statutory remedies of the ADEA and ADA, while limiting state employees to recovery under the state statutory schemes which varied widely amongst themselves and differed from the federal scheme.

Plaintiff attempts to draw a broad generalization that all victims of employment discharge in violation of Oklahoma public policy are a single class and are all entitled to identical recovery under the statutory schemes. The legislatively-created statutory schemes must provide equal treatment to those who are covered by the scheme, but are not required to provide equal treatment to those outside the reasonable classification of persons covered by the scheme. The Oklahoma legislature has provided avenues of recovery for victims of disability discrimination that are not available to victims of other forms of employment discrimination. Such a legislative determination is not an unreasonable classification of persons, and does not require that victims of gender discrimination, such as plaintiff, be entitled to recovery in addition to the limitations of Title VII. Accordingly, this Court does not find that the absence of availability of a Burk tort claim to plaintiff is in violation of the principles of the Oklahoma and United States Constitutions. For this reason, defendants' motion for summary judgment must be granted as to plaintiff's claim for unlawful termination in violation of Oklahoma Public Policy.

**V.**

Plaintiff's third claim alleges that she is entitled to relief pursuant to Title VII of the Civil Rights Act of 1964 for sexual harassment. Title VII prohibits an employer from discriminating against an employee on the basis of sex "with respect to [her] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Workplace sexual harassment may take either of two forms: (1) "hostile work environment" harassment, which consists of offensive gender-

based conduct that is severe or pervasive; or (2) "quid pro quo" harassment, which "occurs when submission to sexual conduct is made a condition of concrete employment benefits." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987).  Originally, plaintiff based her Title VII sexual harassment complaint on hostile work environment.  In her response to defendants' motion for summary judgment, plaintiff alleges both (A) hostile work environment and (B) quid pro quo sexual harassment (Dkt. # 54).

## A.

To show actionable sexually discriminating or harassing conduct by Moss for which UMC would be liable under Title VII, plaintiff must demonstrate that the terms and conditions of her employment were negatively impacted by Moss' behavior.  More specifically, she must show that a rational jury could find that the "workplace [was] permeated with 'discriminatory intimidation, ridicule and insult,' that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993).  "The plaintiff must produce evidence that she was the object of harassment because of her gender." Penry v. Fed. Home Loan Bank, 155 F.3d 1257, 1261 (10th Cir. 1998).  The frequency and severity of the discriminatory conduct, whether it is physically threatening, humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance, are all factors to be considered in the course of this determination.  Harris, 510 U.S. at 23.  The Supreme Court has emphasized that:

> [a] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so. . . . [S]imple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (internal quotations and citations omitted).  Further, the Tenth Circuit has clarified that to demonstrate a hostile work environment, a plaintiff must present "admissible evidence that she was subjected to a steady barrage of opprobrious [sexual] comments."  Gross v. Burggraf Const. Co., 53 F.3d 1531, 1543 (10th Cir. 1995).  However, the plaintiff "need not demonstrate psychological harm, nor is she required to show that her work suffered as a result of the harassment."  Penry, 155 F.3d at 1261.

Plaintiff has not shown that the conduct of Moss was so extreme as to change the terms and conditions of her employment, nor has she shown that she was subjected to a barrage of offensive comments.  Plaintiff describes two incidents related to this claim, both in January 2002: first, when defendant Moss allegedly leaned over her, commented that her husband might not have to take a pay reduction if she "would just cooperate," brushed his hand over her breast, and squeezed her shoulder; and, second, when Moss blocked her from leaving the supply room, again touched her shoulders, and commented "[s]orry it has to be this way." Dkt. # 38, Ex. A, First Amended Petition, at 2-3.   Plaintiff states that harassment continued  into March 2002 in the form of Moss unnecessarily touching her hand while passing items.  While no woman should be made to feel uncomfortable in the workplace by virtue of a male supervisor leaning into her and brushing against her, because plaintiff can point to only two incidents, her work environment cannot be perceived as being pervaded by hostility toward women.  Two incidents between January and June 2002 is

13

difficult to characterize as a "steady barrage."[1]  Consequently, the Court finds that, even taken in the light most favorable to plaintiff, there is insufficient evidence to support a hostile work environment claim, and summary judgment is appropriate.

## B.

This Court recognizes that plaintiff failed to plead a quid pro quo sexual harassment claim. However, because defendants address this issue in their motion for summary judgment (Dkt. # 38), and plaintiff responded (Dkt. # 54), the Court will address it.

The "gravamen of a quid pro quo sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct." Hicks, 833 F.2d at 1414. Plaintiff states that "Moss' threats of reducing the Plaintiff's husbands' [sic] salary at the same time that he was telling Plaintiff that it didn't have to happen and touching her in a sexual manner, could be considered nothing other than quid pro quo sexual harassment." Dkt. # 54, at 25.  Plaintiff argues that "an invitation to prevent financial harm to the Plaintiff's family in exchange for sexual favors"

---

[1]     See, e.g., Sprague v. Thorn Americas, Inc., 129 F.3d 1355 (10th Cir. 1997) (supervisor's conduct consisting of five incidents over sixteen months including commenting that plaintiff "really need[ed] to undo that top button;" in a conversation about whether "the girls [were] going down to aerobics," replying, "Hey, you can't call them girls. You have to call them ladies;" bringing up the subject of women and PMS and commenting "you know how they are at that time of the month . . . ;" putting his arm around her and looking down her dress, then saying "well, you got to get it when you can;" and in a conversation about what to call "neck chains," saying, "neck chains! That sounds kind of kinky" was unpleasant and boorish but insufficient to create a hostile work environment). But see, e.g., O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1098-1102 (10th Cir. 1999) (jury could find hostile work environment where plaintiff heard male co-worker compare his wife to Playboy magazine, describe a dream involving a naked woman, make frequent derogatory comments about women, and tell other employees that plaintiff was planning to file a sexual harassment suit against him, and where plaintiff alleged that such conduct caused her to be ostracized by her co-workers and to have difficulty doing her job).

violates Title VII.  Id. at 27.  Plaintiff, in effect, alleges that Moss conditioned her husband's salary upon sexual favors from her.  However, plaintiff reads Title VII too broadly.  Title VII forbids

> an employer - -
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.

42 U.S.C. § 2000e-2(a)(1) (emphasis added).  The plain text of Title VII requires that the person whose employment conditions are adversely affected also be the person who is discriminated against on the basis of sex.  Specifically, the statute's use of the pronoun "his" limits the scope of protection to the employment of the individual facing sexual harassment.  Therefore, even assuming, for the purposes of summary judgment only, that a reasonable person could find Moss' conduct was of a sexual nature, plaintiff incorrectly assumes that Title VII protects conditions of her husband's employment.  This Court rejects plaintiff's proposed extension of the statute.  Rather, the Court adheres to the plain language of Title VII, thus precluding third-party protection.[2]  Accordingly, plaintiff's stated basis for a quid pro quo sexual harassment claim falls outside the scope of Title VII protection.

Further, even if the Court were to assume that Moss' conduct was of a sexual nature and, additionally, that it related to conditions of plaintiff's employment, plaintiff has failed to raise a

---

[2]    See Fogleman v. Mercy Hospital, Inc., 283 F.3d 561, 569 (3rd Cir. 2002) (finding that, with regard to third-party retaliation claims, "a conflict between [an anti-discrimination] statute's plain meaning and its general policy objectives . . . ought to be resolved in favor of the statute's plain meaning"); Smith v. Riceland Foods, Inc., 151 F.3d 813, 819 (8th Cir. 1998) (acknowledging that not following Title VII's plain meaning would create problems in deciding who qualifies for protection under the statute); Holt v. JTM Industries, Inc., 89 F.3d 1224, 1227 (5th Cir. 1996) (concluding that deviating from the plain language of the Age Discrimination in Employment Act would create line-drawing problems with regard to standing).

genuine issue of material fact as to a causal connection between Moss' alleged sexual conduct and her eventual termination.  "The relevant inquiry in a quid pro quo case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances."  Karibian v. Columbia University, 14 F.3d 773, 778 (2nd Cir. 1994) (finding quid pro quo harassment where plaintiff's supervisor made and threatened to make decisions affecting the terms and conditions of her employment based upon her submission to his sexual advances).  Plaintiff must show that an adverse employment action "resulted from" sexual harassment, which means there must be a causal connection between the two.  See Burlington Industries, Inc. V. Ellerth, 524 U.S. 742, 753-54 (1998) ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII.").   In evaluating a causal connection in a quid pro quo claim, this Court finds persuasive cases interpreting a causal connection in other employment contexts.  Causal connection may be demonstrated by circumstantial evidence that justify an inference of discrimination, such as temporal proximity.  See Burrus v. United Telephone Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir. 1982).

The record does not support the conclusion that plaintiff's termination resulted from Moss' alleged sexual conduct.  Plaintiff was terminated on June 4, 2002, more than four months after the alleged quid pro quo sexual harassment in January 2002.  Temporal proximity of four months "by itself [is] not [] sufficient to justify an inference of causation."  Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (upholding summary judgment on a retaliation claim where there was a "four month time lag between [plaintiff's] participation in protected activity and his termination").  Plaintiff offers no evidence that plaintiff's termination resulted from rejection of

Moss' alleged sexual invitations.  Accordingly, the Court grants defendants' motion for summary

judgment as to this claim.

## VI.

Plaintiff's fourth claim is based upon Title VII's prohibition of discrimination by employers

against employees in retaliation for opposing unlawful employment practices.  See 42 U.S.C. §

2000e-3(a).[3]  To survive summary judgment, plaintiff must show that her termination resulted from

retaliatory animus.  This burden can be met either through establishing discrimination directly or

through the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Although plaintiff does not argue that she has direct evidence of retaliatory animus, the Court

views the record in a light most favorable to the nonmoving party to determine whether there is such

evidence.  In his testimony, Moss admitted that "[p]rior to [plaintiff's] termination . . ., [Moss] wrote

an e-mail to Bishop Blake that said that she had threatened to go to the EEOC and when asked about

that by Counsel, [he] said that [his] response to [plaintiff] was 'That wouldn't surprise me.'" Dkt.

# 38, Ex. H, Deposition of Defendant Rev. Danny Moss, at 110.  In his email to Bishop Blake, Moss

acknowledged that he was aware of a possible EEOC filing by plaintiff:

> Linda [Bolin] also informed me she has sought outside counsel and the EEOC board.
> (I guess that's the Labor Board).  So, I'm caught between a rock and a hard place.
> If I let her go I'm in a lawsuit and if I keep her - - life around the office is a bummer.

Id., Ex. I, Email from Defendant Rev. Moss to Bishop Blake, at 4.  This evidence shows defendants

were aware that plaintiff was considering a protected activity under Title VII.  However, such

---

[3]      Although this Court has granted summary judgment as to the sexual harassment claims and,
hence, there is no underlying unlawful employment practice, plaintiff's good faith belief that
Title VII was violated is a sufficient predicate for a retaliation claim.  See Love v. RE/MAX
of Am., Inc., 738 F.2d 383, 385 (10th Cir. 1984).

knowledge appears to have discouraged, rather than encouraged, Moss from terminating plaintiff.

Compare Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 550 (10th Cir. 1999) (finding direct

evidence of retaliatory motive in an employer's letter stating that it was firing the plaintiff because

he complained about compensation).  Thus, the Court finds that this evidence is not direct evidence

of retaliatory animus.

Absent direct evidence of retaliatory animus, plaintiff must meet the burden-shifting

McDonnell Douglas standard.[4]  See, e.g., Medlock, 164 F.3d at 549-50.  A prima facie case of

retaliation is established under Title VII if the plaintiff shows that:

> (1) she engaged in protected opposition to Title VII discrimination or participated in
> a Title VII proceeding;
> (2) she suffered an adverse employment action contemporaneous with or subsequent
> to such opposition or participation; and
> (3) there is a causal connection between the protected activity and the adverse
> employment action.

Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1381 (10th Cir. 1994).  Plaintiff meets the first element

in that she formally filed a complaint against defendants with the OHRC on May 24, 2002.  A

---

[4]       Under the McDonnell Douglas framework, once an employee presents a prima facie case of
retaliation, the burden shifts to the employer to produce a legitimate, nondiscriminatory
justification for taking the disputed employment action. Stover v. Martinez, 382 F.3d 1064,
1071 (10th Cir. 2004) (citing McDonnell Douglas, 411 U.S. at 802-04, and Jeffries v.
Kansas, 147 F.3d 1220, 1231 (10th Cir.1998) (applying the McDonnell Douglas framework
to a claim of retaliation)); Jones v. Barnhart, 349 F.3d 1260, 1266 (10th Cir. 2003).  If the
employer is able to do so, the burden shifts back to the employee to show that the employer's
proffered reason is merely a pretext for discrimination.  Jones, 349 F.3d at 1266.  Such
pretext may be demonstrated through direct evidence or by pointing out so many
inconsistencies, implausibilities, incoherencies, or contradictions as to make the employer's
justification unworthy of belief.  Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1120
(10th Cir. 2001); Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).
Summary judgment in favor of the employer is warranted only if the employee has "failed
to produce any evidence from which a reasonable inference could be drawn that [the
employer's] proffered reasons were pretextual."  Jones, 349 F.3d at 1266.

adverse employment action requires "a significant change in employment status." Ellerth, 524 U.S. at 761. In that her employment was terminated on June 4, 2002, plaintiff meets the second element.

The issue in this case relates to the third prima facie element -- the causal connection between the adverse employment action and the "protected opposition." "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus, 683 F.2d at 343. Plaintiff cites to the temporal proximity between her OHRC complaint and termination to establish causation. The Supreme Court has pointed out that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)). In this case, defendants terminated plaintiff eleven (11) days after she filed a complaint with the OHRC. See Annett v. Univ. of Kansas, 371 F.3d 1233, 1240-41 (10th Cir. 2004) ("temporal proximity of under two months was 'sufficiently probative of a retaliatory motive to withstand summary judgment' . . . for purposes of establishing a prima facie case) (quoting Ramirez v. Oklahoma Dep't of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994)). Thus, plaintiff has presented a prima facie case of retaliation by showing that she complained to OHRC and that she was terminated shortly thereafter.

Defendants allege that plaintiff was terminated for the following reasons: (1) opening confidential mail; (2) lying about that fact; and (3) creating an atmosphere of mistrust in the office. Dkt. # 38, Ex. F, June 4, 2002, Termination Letter. Specifically, Moss alleges that plaintiff violated

office policy when she opened private mail from Rev. Combs that was in an envelope addressed to
Moss and marked "confidential."  The termination letter explains:

> Because you have opened personal confidential material and then lied about it, and
> because of the atmosphere you have recently created in our office, and because you
> have violated the basic trust needed to operate a district office, you are hereby and
> immediately terminated.

Id.  Because defendants have articulated legitimate, nondiscriminatory justifications for firing
plaintiff, the burden shifts back to her to show that the proffered reasons are mere pretext for
retaliation.

　　　To defeat summary judgment on her retaliation claim, plaintiff must show that there is a
genuine issue of material fact as to whether defendants' proffered reasons for firing her are
"pretextual – i.e. unworthy of belief."  Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).
Plaintiff argues that the "very close" temporal proximity between her May 24, 2002 filing of a
complaint with the OHRC and her termination on June 4, 2002 is evidence of pretext.  However,
unlike the causation analysis to establish a prima facie case, the Tenth Circuit has held that close
temporal proximity, though a factor in showing pretext, "is not alone sufficient to defeat summary
judgment."  Annett, 371 F.3d at 1240.  Cf. Conner, 121 F.3d 1390, 1397 (noting that temporal
proximity alone does not constitute pretext for retaliatory discharge).  Rather, plaintiff must present

additional evidence of pretext.[5]  To support pretext, plaintiff relies on the following circumstantial evidence: (1) statements showing defendants knew plaintiff was considering "protected opposition;" (2) the alleged absence of negative work reviews; and (3) the allegation that the confidential mail policy, upon which defendants rest their nondiscriminatory reason for termination, was created after the incident that lead to plaintiff's termination.

First, evidence supports the inference that defendants knew plaintiff was contemplating filing with the EEOC.  It is not clear whether defendants had actual knowledge of plaintiff's OHRC filing because OHRC did not notify defendants of her complaint until after she was already terminated. Still, plaintiff alleges that she sent a letter to Bishop Blake on May 13, 2002 to complain of sexual harassment and was subsequently fired on June 4, 2002.  Dkt. # 54, at 30.  Defendants counter that Bishop Blake did not receive the letter until June 5, 2002, after plaintiff was fired.  Bishop Blake testified that he was unaware of any claim of sexual harassment by plaintiff prior to her termination. Dkt. # 38, Ex. E, Deposition of Bishop Blake, at 194.  However, plaintiff offers an audio recording of Bishop Blake admitting having received a complaint from plaintiff prior to her termination.  Dkt.

---

[5]    See Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000) (temporal proximity plus manager's reprimand given to supervisor and evidence that events surrounding lost promotion were considered during deliberation over termination provided sufficient evidence of pretext to raise fact issue); Butler v. City of Prairie Village, Kan., 172 F.3d 736, 752 (10th Cir. 1999) (temporal proximity plus evidence that defendant resurrected plaintiff's job duties under another title, burdened plaintiff with additional duties before firing him, and fired no one else at that time, raised a fact issue); Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 870 (9th Cir. 1996) (temporal proximity plus letters praising plaintiff's interpersonal skills were sufficient to raise question of pretext where employer fired employee for poor interpersonal skills); O'Bryan v. KTIV Television, 64 F.3d 1188, 1194 (8th Cir. 1995) (temporal proximity plus increased job duties and employer's statements indicating retaliatory motive were sufficient to raise fact issue of pretext); San Filippo v. Bongiovanni, 30 F.3d 424, 434, 444 (3d Cir. 1994) (temporal proximity plus supervisors' statements calling plaintiff a "warrior" and referring to "a long history of animus" were sufficient to raise question of pretext).

# 60, Ex. Q, Transcript of June 2002 Meeting with Bishop Blake, Linda Bolin and Ann Lawless, at 6. Regardless, Moss clearly displayed and conveyed to the Bishop his knowledge of plaintiff's interest in filing with the EEOC in his May 2002 email to the Bishop. Dkt. # 38, Ex. I, Email from Defendant Rev. Moss to Bishop Blake, at 4; Id., Ex. H, Deposition of Defendant Rev. Danny Moss, at 110. A reasonable jury might consider these inconsistencies circumstantial evidence of pretext.

Second, plaintiff contends that her work reviews were positive. She alleges that, in late January 2002, Moss told her that she did a "wonderful job here at the District Office" and, on April 5, 2002, Moss assured her that she was welcome to remain employed at the District Office as long as she wanted." Dkt. # 54, at 7-8. Moss identifies only two instances of reprimanding plaintiff over the course of her employment: first, for arriving late to work; and second, for changing her husband's compensation form. Dkt. # 60, Ex. T, Response to Plaintiff's First Set of Interrogatories, at 5. A reasonable jury might consider the dearth of negative work reviews circumstantial evidence of pretext.

Third, plaintiff alleges that the policy, upon which defendants rely to justify firing her, was invented to cover retaliation. She states that no confidential mail policy existed on May 20, 2002, when plaintiff was accused of violating such a policy. Moreover, Moss admits in the May 27, 2002 email to Bishop Blake that he did not fire plaintiff immediately following the incident on May 20, 2002, but rather writes:

> Because I had not specifically given her instructions about handling confidential material I did not fire her. I told her that from now on, anything that comes from anyone marked confidential, is to be placed on my desk unopened.

Dkt. # 38, Ex. I, Email from Defendant Rev. Moss to Bishop Blake, at 4. This May 27, 2002 statement supports an inference that no confidential mail policy existed prior to May 20, 2002. The

week following the email statement, plaintiff was terminated because she allegedly "opened personal confidential material and then lied about it."  Id., Ex. F, June 4, 2002, Termination Letter.  A reasonable jury might consider this confidential mail policy issue circumstantial evidence of pretext.

To determine whether plaintiff has made an appropriate showing of pretext, the Court must consider the record as a whole.  See Annett, 371 F.3d at 1241.  Evidence of defendants' awareness of plaintiff's threatened contact with the EEOC, the absence of negative work reviews, and the dispute regarding the origins of the confidential mail policy satisfies the requirement that more than temporal proximity be shown.  Such evidence, taken together, creates a genuine issue of material fact as to whether defendants' articulated nondiscriminatory justifications for firing plaintiff are pretextual.  Thus, defendants' motion for summary judgment as to plaintiff's retaliation claim must be denied.

## VII.

Plaintiff's final claim of slander is barred by the one-year statute of limitations set forth in Okla. Stat. tit. 12, § 95(4) (2001).  Under that provision, a plaintiff has one year from the date of the alleged slanderous statement in which to bring a claim for slander.  Id.; see Digital Design Group, Inc. v. Information Builders, Inc., 24 P.3d 834 (Okla. 2001).

Plaintiff argues that she is entitled to relief based upon "Moss spread[ing] slanderous inflammatory comments to other pastors of the church."  Dkt. # 54, at 13.  In support of her slander claim, plaintiff offers evidence that, in July 2002, Moss emailed multiple pastors in UMC regarding plaintiff's termination and published that plaintiff was angry and attempting to retaliate against his office.  Dkt. # 60, Ex. S, Letter from Linda Green.  Further, plaintiff alleges that Moss told others "that he could not trust the Tulsa District Administrative Assistant Linda Bolin."  Dkt. # 54, at 14.

This statement described plaintiff as employed by the District Office and is, therefore, before her termination in June 2002.  Plaintiff claims that Moss gave poor job performance reviews to plaintiff's potential employers but offers no evidence to support this allegation.  Such alleged communications were made in the summer of 2002, prior to plaintiff securing new employment in October 2002.  Dkt. # 60, Ex. A, Deposition of Linda Bolin, at 158-63.  The burden is upon the plaintiff to prove what unprivileged false or malicious statements were made and when.  Plaintiff offers no evidence that alleged slanderous statements made by Moss concerning plaintiff occurred after October 2002.  Since plaintiff did not file her lawsuit until June 8, 2004, this claim is time-barred.  Accordingly, the Court does not reach the issue of whether the alleged statements were true or privileged communications.  Plaintiff's slander claim fails as a matter of law.

## VIII.

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment (Dkt. # 38) is **granted** in part and **denied** in part: it is **granted** as to plaintiff's claims of intentional infliction of emotional distress, violation of Oklahoma public policy, sexual harassment, and slander; it is **denied** as to plaintiff's claim of retaliation.

**DATED** this 21st day of October, 2005.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

24